**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0258-24

TROY WEYGANDT,

    Plaintiff-Appellant,

v.

GETINGE US SALES, LLC,
MANPOWER US INC., and
NEVAR BOOKER,

    Defendants-Respondents.

_____

Submitted April 1, 2025 – Decided May 7, 2025

Before Judges Smith and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0195-24.

Castronovo & McKinney, LLC, attorneys for appellant (Thomas A. McKinney, of counsel and on the briefs; Anais V. Paccione, on the briefs).

K&L Gates LLP, attorneys for respondents Getinge US Sales, LLC and Navar Booker (Vincent N. Avallone and Christopher J. Manley, on the brief).

PER CURIAM

Plaintiff Troy Weygandt appeals from the April 29, 2024 order of the Law Division granting defendant Manpower, U.S. Inc.'s ("Manpower") motion to dismiss and compel arbitration against all defendants and the August 16, 2024 order denying plaintiff's motion for reconsideration of the April 29, 2024 order. We reverse as to defendants Getinge USA Sales, LLC ("Getinge") and Nevar Booker.[1]

## I.

Manpower provides staffing services to Getinge pursuant to a Master Services Agreement ("Master Agreement"), and a Statement of Work. Datascope Corp. ("Datascope") is an affiliate of Getinge. Booker is a manager for Datascope.[2]

In November of 2022, Manpower hired plaintiff and assigned him to perform services at Datascope as a Second Shift Team Leader. As part of the onboarding process with Manpower, plaintiff executed an Arbitration Agreement (the "Agreement"). The Agreement states the following in pertinent part:

---

[1] Plaintiff does not appeal the part of the order compelling arbitration against Manpower.

[2] Datascope, Getinge, and Booker are collectively referred to as "Datascope defendants".

A-0258-24

I agree and acknowledge that [Manpower], and I will utilize binding arbitration to resolve any disputes that may arise between us . . . .

A. [Manpower] and I mutually agree that any claim, dispute, and/or controversy that either I may have against [Manpower] (or its owners, parents, subsidiaries, affiliates, directors, officers, managers, employees, agents, or parties affiliated with their employee benefit and health plans) or that Manpower may have against me, arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, separation from employment, or any other association with Manpower shall be submitted to, resolved, and determined exclusively by a single arbitrator in binding arbitration under the Federal Arbitration Act . . . to be administered by the American Arbitration Association pursuant to its applicable Rules . . . . Included within the scope of this Agreement are all disputes, whether based on tort, contract, statute (including, but not limited to, any claims of trade secrets, unfair competition, compensation, classification, minimum wage, expense reimbursement, overtime, breaks and rest periods, or retaliation, discrimination and harassment, . . .) equitable law, or otherwise.

. . . .

E. I understand that I may opt-out and not be subject to arbitration. To opt-out, I must select the "decline" option below. I further understand that I will not be subject to any adverse employment action because I choose to opt out.

F. I understand and agree to this mutually binding arbitration agreement and that I and [Manpower] give up our respective rights to trial in court or by jury or

3

A-0258-24

any claim that I may have against [Manpower] or that [Manpower] may have against me.

[boldface omitted.]

Plaintiff signed the Agreement without opting out of arbitration.

Plaintiff alleges that approximately five months after he began his position at Datascope, Booker called a meeting of Datascope's employees. During the meeting Booker discussed Datascope's attendance policy, and informed the employees that "any absence would count as a point and more points would lead to disciplinary action, and termination." Plaintiff raised concerns with Booker, his immediate supervisor, Alberta Sherifi, and the Datascope human resources department regarding the legality of the sick time policy. The next day, Manpower told plaintiff that Datascope had made a "business decision" not to bring plaintiff back.

In February 2024, plaintiff filed a complaint against Datascope defendants and Manpower alleging defendants violated the Conscientious Employee Protection Act ("CEPA"). Manpower moved to compel arbitration and dismiss the complaint. The Datascope defendants also moved to compel arbitration and stay the litigation.

On April 29, 2024, the trial court entered an order granting Manpower's motion to compel arbitration and dismissing plaintiff's complaint in its entirety,

A-0258-24

without prejudice. The trial court denied Datascope defendants' motion to compel arbitration and stay litigation as moot, reasoning it had already sent the entire case to arbitration.

The court framed the issue as "whether the contract signed between Manpower and [p]laintiff was intended to be for the benefit of [Datascope]." The court determined that under the Master Agreement and the Statement of Work, it was "undisputed," that Datascope defendants "were intended third-party beneficiaries of the [A]greement." The court reasoned the Statement of Work stipulated, "that Manpower would provide their client, Datascope, staffing services," and that plaintiff was jointly employed by Manpower and Datascope. Further, the court determined plaintiff knew he was going to be working for someone other than Manpower when he signed the Agreement, therefore, "[i]t is clear that he agreed to arbitrate disputes with the party to which he was assigned." Thus, the court found the claims against Datascope defendants, as "intended third-party beneficiaries of the Agreement," were covered, and the Agreement was enforceable.

Plaintiff filed a timely motion for reconsideration as to the Datascope defendants. On August 16, 2024, the trial court entered an order denying the motion for reconsideration.

5

On appeal, plaintiff contends that the court mistakenly applied contract law to find that the Datascope defendants were third-party beneficiaries to the arbitration agreement to which they are not signatories.

## II.

Our review of the court's interpretation and construction of a contract is de novo. Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014). A court must apply state contract principles to determine whether a valid agreement to arbitrate exists. Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006). The court must first determine if a valid agreement exists and then determine the scope of the agreement. A contract requires that there exist two parties willing to enter into such a contract and thereafter an offer of such willingness. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (internal citations omitted) ("Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.").

Our task is to "ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd. v. Essex Cty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). "Where the

A-0258-24

terms of a contract are clear, we enforce the contract as written and ascertain the intention of the parties based upon the language." Pollack v. Quick Quality Rests., Inc., 452 N.J. Super. 174, 187-88 (App. Div. 2017).

It is well established that arbitration agreements are afforded favored status and should be read liberally. Garfinkel v. Morristown Obstetrics & Gynecology Assocs. P.A., 168 N.J. 124, 132 (2001) (quoting Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993)). However, while such agreements enjoy a favored status, they are not automatically enforceable pursuant to such preference and instead must meet the standards applicable to the enforceability of contracts generally. Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 441-42 (2014). Our Court has made clear that "[a]n agreement to arbitrate, like any other contract, 'must be the product of mutual assent, as determined under customary principles of contract law.'" Id. at 442 (quoting NAACP of Camden Cnty. E. v. Foulke Mgmt., 421 N.J. Super. 404, 424 (App. Div. 2011)). Although we employ a strong public policy favoring arbitration, "[w]hatever words compose an arbitration agreement, they must be clear and unambiguous that a consumer is choosing to arbitrate disputes rather than resolve them in a court of law." Id. at 447. As our Supreme Court explained when deciding the enforceability of an arbitration provision, "'traditional

7

principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third[-]party beneficiary theories, waiver and estoppel.'" Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 188 (2013) (internal emphasis omitted) (quoting Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009)).

"The standard applied by courts in determining third-party beneficiary status is 'whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts . . . .'" Reider Cmtys., Inc. v. Twp. of N. Brunswick, 227 N.J. Super. 214, 222 (App. Div. 1988) (quoting Brooklawn v. Brooklawn Hous. Corp., 124 N.J.L. 73, 77 (E. & A. 1940)). "[T]he intention of contracting parties to benefit an unnamed third party must be garnered from an examination of the contract and a consideration of the circumstances attendant to its execution." Ibid. "The principle that determines the existence of a third[-] party beneficiary status focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement." Broadway Maint. Corp. v. Rutgers, The State Univ., 90 N.J. 253, 259 (1982) (footnote omitted).

When there is no express, signed arbitration agreement between certain parties in a given matter, "careful scrutiny is necessary to determine whether arbitration is nonetheless appropriate." Hirsch, 215 N.J. at 196. The seminal decision in Hirsch makes it clear that such enforcement by a non-party or non-signatory is only permissible under limited circumstances, which do not exist on this record. Here, the Agreement does not mention the Datascope defendants by name, nor does it state the intent to confer arbitration rights upon a third-party. Further, the Agreement does not contain an assignment clause assigning Datascope defendants' rights under the Agreement.

The fact that plaintiff signed an Agreement with Manpower that contains that phrase "any dispute" does not equate to plaintiff knowingly and purposely conferring the benefit of the arbitration clause in question upon the Datascope defendants. Nor is there anything in the record presented to suggest that the circumstances attendant to the execution of the Agreement somehow should afford the Datascope defendants third-party beneficiary status. To the contrary, Manpower and Datascope have a sophisticated corporate/business relationship. If Datascope was to be covered by the terms of the Agreement, the same could have easily been accomplished with additional direct and express language as

9

contemplated and required by our caselaw when an individual is giving up certain rights with respect to dispute resolution.

The subject Agreement is between two parties and two parties alone: plaintiff and Manpower. The Agreement is silent as to Datascope defendants. Furthermore, the "Arbitration" provision of the Agreement is also silent as to Datascope defendants stating only that disputes between plaintiff and "Manpower (or its owners, parents, subsidiaries, affiliates, directors, officers, managers, employees, agents, or parties affiliated with their employee benefit and health plans) . . . ." will utilize binding arbitration. As such, the Agreement in no way requires arbitration of claims against any other party besides Manpower.

Finally, Manpower, is a staffing agency which assigns various individuals for work at different companies, while Datascope is a completely separate entity. The record shows the two distinct business entities merely conduct business with each other in the sense that Manpower provides staffing services for a fee from Datascope.

Datascope's argument that the details of plaintiff's work confer third-party beneficiary status by inextricably linking the parties and putting plaintiff on notice that the Agreement with Manpower would also flow to Datascope is

10

undermined by the specific wording of the Agreement. As the focus is plaintiff's intent, the facts and attendant circumstances demonstrate that plaintiff did not intend Datascope to benefit from the existence of the Agreement but rather any benefit so derived would arise merely as an unintended incident of the agreement.

In this case, the need to protect citizens' rights to access the courts outweighs the general preference for arbitration. While arbitration is generally favored and we try to avoid piecemeal litigation, those considerations are not strong enough to override the plaintiff's right to bring a lawsuit — especially when the argument for arbitration is based on a narrow and restrictive third-party beneficiary theory, and there is no clear mutual agreement, intent, or understanding between the parties.

Reversed. The complaint is reinstated as to the Datascope defendants only, and the matter is remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0258-24